UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER BURTON; FRANCIS BURTON;
and NIAYA BURTON, by her next friend,
FRANCIS BURTON; ARNOLD WOOD;
and FREDDIE KENNEDY-NEAL; On
Behalf of Themselves and All Others
Similarly Situated,

     Plaintiffs,

v.                                Case No. 04-72735

WILLIAM BEAUMONT HOSPITAL;        HONORABLE AVERN COHN
BEAUMONT PROPERTIES, INC.; and
AMERICAN HOSPITAL ASSOCIATION,

     Defendants.

_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS COUNT ONE OF THE
## FIRST AMENDED COMPLAINT, GRANTING DEFENDANTS' MOTION FOR
## JUDGMENT ON THE PLEADINGS AS TO STATE LAW COUNTS,
## AND DISMISSING CASE

### I. Introduction

This is a putative class action health-care case.[1]  Plaintiffs Jennifer Burton;

Francis Burton; and Niaya Burton[2] (collectively referred to as the Burtons); Arnold Wood

(Wood); and Freddie Kennedy-Neal (Kennedy-Neal) are suing Defendants William

---

[1] Plaintiffs on March 8, 2005, filed a motion for class certification.  Defendants have moved (1) to dismiss Count One of the first amended complaint and (2) for judgment on the pleadings.  Accordingly, disposition of defendants' pending motions is necessary before addressing plaintiffs' class certification motion.

[2] Niaya Burton is a minor and is represented in this action by her mother, Francis Burton.  Although the first amended complaint also lists Francis Burton as a separate named plaintiff, the first amended complaint does not contain allegations of any medical care sought or received by Francis Burton for herself.

Beaumont Hospital and Beaumont Properties, Inc. (collectively referred to as Beaumont); and American Hospital Association (AHA).

Plaintiffs assert the following claims in the first amended complaint:

| Count | Claim |
|-------|-------|
| 1 | Violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; |
| 2 | Breach of Contract Under Michigan Law; |
| 3 | Violation of the Michigan Consumer Protection Act (MCPA), MICH. COMP. LAWS § 445.901 et seq.; |
| 4 | Unjust Enrichment/Constructive Trust Under Michigan Law; |
| 5 | Declaratory Judgment/Injunctive Relief Under Michigan Law; |
| 6 | Breach of Fiduciary Duties Under Michigan Law; |
| 7 | Civil Conspiracy/Concert of Action; and |
| 8 | Aiding and Abetting.[3] |

Before the Court are (1) Beaumont's Motion to Dismiss Count One of the First Amended Complaint and (2) Beaumont's Motion for Judgment on the Pleadings as to State Law Counts (Counts Two through Six).  For the reasons that follow, the motions are GRANTED and this case is DISMISSED.  The remaining pending matters in this case, namely (1) Plaintiffs' Motion for Class Certification and (2) Plaintiffs' Motion to Compel, are DISMISSED AS MOOT.

_____

[3] Plaintiffs filed the first amended complaint on January 28, 2005.  The first amended complaint only makes allegations against AHA in Counts Seven (civil conspiracy/concert of action) and Eight (aiding and abetting).  On March 2, 2005, the parties stipulated to dismiss without prejudice counts seven and eight of the first amended complaint.  Accordingly, AHA is no longer a defendant and this case is proceeding against Beaumont only.

2

## II. Background

## A. Factual Background

## 1. Plaintiffs' General Allegations

Plaintiffs have previously been patients at William Beaumont Hospital.[4]  They were, in some instances, uninsured when they sought treatment at Beaumont.  They say they chose Beaumont for medical care "because it is their community nonprofit hospital," Am. Compl. at ¶ 1, and "because they believed that Beaumont is a nonprofit 'charitable' hospital."  Id. at ¶ 5.  Plaintiffs claim that Beaumont charges uninsured patients rates that are significantly higher than the rates charged insured patients or patients covered by Medicare or Medicaid.  Id. at ¶ 8.  In addition to what plaintiffs say is "price goug[ing]," id. at ¶ 7, "overbilling after the fact," id. at ¶ 20, and "discrimination against the vulnerable," id. at ¶ 25, plaintiffs complain that Beaumont requires uninsured patients to sign a form contract promising to pay Beaumont in full for their medical care.  Id. at ¶ 20.  Plaintiffs say that Beaumont "months or years later" uses this form contract as a basis for recovering "inflated amounts" from uninsured patients.  Id. at ¶ 21.

---

[4] William Beaumont Hospital operates two campuses: one in Royal Oak, Michigan (Royal Oak Beaumont); and one in Troy, Michigan (Troy Beaumont).  The emergency room at Royal Oak Beaumont is the busiest emergency room in Michigan. Def. Mot. to Dismiss Br. at 1.

## 2. The Named Plaintiffs

### a. Jennifer Burton

Jennifer Burton, a resident of Detroit, Michigan, was treated at Beaumont on three occasions.

In the summer of 2002, she went to the emergency room at Royal Oak Beaumont.  Id. at ¶ 42.  She presented a severe headache and flu-like symptoms.  Id. She had to sign forms upon admission that guaranteed she would pay the medical charges, and then she waited to be evaluated and treated.  Id.  Once she was seen, it was determined that she did not have a serious condition.  Id.  Hospital staff gave her Motrin for her headache and discharged her.  Id.

Jennifer Burton went to Royal Oak Beaumont in early 2003 for the same symptoms, i.e., a headache and flu-like symptoms.  Id. at ¶ 43.  She says that she again was required to sign forms upon admission that guaranteed payment of her medical charges.  Id.  She says that she had to wait for approximately an hour and a half before she was called to the screening and treatment area.  Id.  As with her first visit, she was given Motrin and discharged.  Id.

Finally, Jennifer Burton went to Troy Beaumont in late 2003 for severe back and abdominal pain.  Id. at ¶ 44.  She again had to sign forms upon admission that guaranteed payment of her medical charges.  Id.  She was given an injection for pain and discharged.  Id.

Jennifer Burton says that Beaumont "billed her excessive and inflated rates" for

4

her medical care.  Id. at ¶ 45.[5]  She also says that Beaumont "aggressively pursued the collection of these inflated charges from Ms. Burton."  Id. at ¶ 46.  She says Beaumont "sent numerous harassing bills and collection letters, and threatened to damage her credit due to her medical debt if she did not pay the entire inflated bill."  Id.[6]

### b. Niaya Burton

Francis Burton took her minor daughter, Niaya Burton, to Royal Oak Beaumont for symptoms of asthma and bronchitis.  Am. Compl. at ¶¶ 47-49.  Francis was required to sign forms upon admission that guaranteed payment of medical charges before Niaya was evaluated or treated.  Id. at ¶ 51.  The first amended complaint says she was billed "inflated charges" for the daughter's medical care and that Beaumont "aggressively pursued the collection of these inflated charges from Ms. Burton" through "numerous harassing bills and collection letters" and threats to "damage her credit due to her medical debt."  Id. at ¶ 52.  Beaumont obtained a judgment against Francis Burton in January 2004 in the amount of $2,632.00 for her medical debt.  Id. at ¶ 53.

---

[5] Significantly, as is true for all of the allegations for each plaintiff, the first amended complaint recites no facts leading to the conclusion that Beaumont charged plaintiffs "excessive and inflated rates."

[6] The first amended complaint says nothing about the rates Beaumont charged Jennifer Burton for her medical care.  She says that she has requested but has not yet been provided with itemized bills detailing the charges.  Id. at ¶ 45.  Despite this, however, and especially in light of the allegation that says she received bills and collection letters, she should have been able to provide the sum total of the charges.  As was noted in the December 3, 2004 Order, omitting specific details regarding the amounts charged the plaintiffs is conspicuous, given that the essence of their complaint is an allegation that they were overcharged for medical care.  See Dec. 3, 2004 Order at 3 n.7.

### c. Arnold Woods

Arnold Woods was admitted to Royal Oak Beaumont's emergency room on November 12, 2001. Id. at ¶ 56. He presented complaints of low back pain, which he says may have been related to previous injuries he sustained in a car accident. Id. He says that he was required to sign forms upon admission that guaranteed payment of his medical charges. Id. He also says that he "sat in the hall for hours" before he was evaluated and treated. Id. His medical records reflect an admission time of 11:15 p.m., which he says was "hours after [he] arrived at the ER."[7] Id. at ¶ 58. He says that the medical staff took X-Rays of his lumbar spine and diagnosed him with a back sprain. Id. at ¶¶ 58-59. He received Valium and an anti-inflammatory medication, and he was given a prescription for a muscle relaxant and told to take Motrin or Tylenol for pain. Id. at ¶ 59. He was discharged at 3:23 a.m. Id.

Woods says that Beaumont billed him "excessive and inflated rates for her [sic] medical care." Id. at ¶ 60. He says that Beaumont charged him $741.32 for his evaluation and treatment and that Beaumont "aggressively pursued the collection of these inflated charges" through "numerous bills and letters." Id. at ¶¶ 60-61. He says his mother paid Beaumont on Woods' behalf a total of $526.00 and that Beaumont turned Woods' account over to a collection agency that has harassed the Woods family in an effort to collect the remaining $215.32 balance. Id. at ¶¶ 62-63.

---

[7] Woods says nothing supporting the conclusion that his admission time was hours after his arrival at the emergency room, because he does not indicate when he arrived.

6

### d. Freddie Kennedy-Neal

Freddie Kennedy-Neal went to Royal Oak Beaumont's emergency room on June 20, 2004, because she was experiencing numbness in her legs. Id. at ¶¶ 65-66. She was required to sign forms upon admission that guaranteed payment of her medical charges. Id. at ¶ 66. She waited in the waiting room for a "short period of time" before being called to the treatment area. Id. She says the hospital performed lab work, a chest X-Ray, and an EKG. Id. at ¶ 67. Beaumont billed her $2,303.00 for her emergency room visit. Id. She says Beaumont turned over her bills to a collection agency that has called her home and sent letters. Id. at ¶ 68.

### B. Procedural Background

This action is one of dozens of similar lawsuits that uninsured and indigent patients have filed in federal courts across the country against some of the nation's largest hospital groups. The plaintiffs in these actions allege that private non-profit hospitals are, inter alia, violating federal law regarding providing charity care. See, e.g., Terry Carter, Who Pays Hefty Hospital Tabs?, A.B.A. JOURNAL, Jan. 2005, at 14.

Several claimants filed motions with the Judicial Panel on Multidistrict Litigation (JPML) to transfer and consolidate the pending actions to a single district under 28 U.S.C. § 1407. Plaintiffs here filed a Motion to Stay Proceedings Pending Transfer to Multidistrict Litigation (MDL). The Court denied the motions and ordered the action to proceed in the regular course. See Sept. 28, 2004 Order. On October 19, 2004, the JPML issued an order denying the motion to transfer and consolidate. In re Not-For-Profit Hospitals/Uninsured Patients Litigation, 341 F. Supp. 2d 1354 (J.P.M.L 2004). The Panel noted that the movants "have failed to persuade us that these actions share

7

sufficient common questions of fact to warrant Section 1407 transfer." Id. at 1356.

None of the courts across the country that have been presented with cases containing allegations similar to those plaintiffs present here has ruled for the plaintiffs on any substantive legal issue.  As one court recently noted with respect to the novel federal claims plaintiffs presented, "Plaintiffs here have lost their way; they need to consult a map or a compass or a Constitution because Plaintiffs have come to the judicial branch for relief that may only be granted by the legislative branch." Kolari v. New York-Presbyterian Hosp., 2005 WL 710452, *1 (S.D.N.Y. Mar. 29, 2005).

On September 17, 2004, Beaumont and AHA filed motions to dismiss under Fed. R. Civ. P. 12(b)(6).  After reviewing the parties' papers and hearing oral argument, the Court on December 3, 2004, granted the motions in part and denied them in part.  The complaint as originally filed asserted twelve counts, all of which were against Beaumont and two of which also were against AHA.  Of the twelve counts, five arose under federal law and seven under state law.[8]  The Court held that dismissal was appropriate for all of the federal-law claims.  The Court also held that the state-law claims could not be dismissed because the parties did not brief their viability.  Additionally, the Court observed that the complaint as originally filed was not in conformity with Fed. R. Civ. P. 8 because it was highly argumentative and did not contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a).

---

[8] The Court exercised subject-matter jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

8

Plaintiffs filed the first amended complaint on January 28, 2005.[9]  In addition to amending their EMTALA claim, plaintiffs added two named plaintiffs: (1) Arnold Wood and (2) Freddie Kennedy-Neal, and added a claim that did not appear in the original complaint: breach of fiduciary duties under Michigan law (Count Six).  Plaintiffs maintained in the original complaint that Beaumont is liable to them primarily under federal law.  In the first amended complaint, however, they maintain that Beaumont is liable to them primarily under state law.  The basis for subject-matter jurisdiction is federal question jurisdiction, 28 U.S.C. § 1331, premised on the only federal claim plaintiffs now assert: Count One (the EMTALA claim).  The Court exercises supplemental jurisdiction over the state-law claims, Counts Two through Six, under 28 U.S.C. § 1367(a).[10]

---

[9] Although plaintiffs did not file a motion for leave to amend the complaint, the order of Dec. 3, 2004, implicitly gave plaintiffs authorization to file an amended complaint: "[i]f the Burtons believe that they have a stand-alone EMTALA claim, they must file an amended complaint and properly plead an EMTALA claim."  Dec. 3, 2004 Order at 17.

[10] The Court again observes that, like the original complaint, the first amended complaint is highly argumentative and sets forth many legal conclusions rather than simply setting forth the factual background in a non-argumentative, non-conclusory, and non-inflammatory manner.  Given the standard under Fed. R. Civ. P. 8 and the nature of the claims made, plaintiffs should include specific factual allegations.  They have not, however, established an appropriate balance.  In some paragraphs the facts alleged are very specific, while in other paragraphs the plaintiffs make legal conclusions.

### III. Discussion

### A. Beaumont's Motion to Dismiss Count One: EMTALA

### 1. Legal Standard

A Fed. R. Civ. P. 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted.  "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief."  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).  "To survive a motion to dismiss under Rule 12(b)(6), a 'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n., 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).

### 2. EMTALA Generally

In 1986, Congress enacted EMTALA, 42 U.S.C. § 1395dd, in response to a growing concern about "the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured."  H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 726-27.  The Act is designed to discourage hospitals from "patient dumping," i.e., failing to provide a medical screening or transferring or discharging a patient based only on a patient's financial inadequacy.  See Cleland v. Bronson Health Care Group, 917 F.2d 266, 268 (6th Cir. 1990).

10

EMTALA sets forth three basic requirements for hospitals with emergency departments:

First, Subsection (a) requires the hospital to "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists."  42 U.S.C. § 1395dd(a).

Second, if the hospital determines that a patient has an "emergency medical condition," subsection (b) requires the hospital to further examine the patient and provide appropriate treatment to stabilize the medical condition, or to transfer the patient to another medical facility.  Id. at § 1395dd(b)(1).

Finally, subsection (c) restricts transfers of patients with unstabilized emergency conditions unless the patient makes an informed request, a doctor signs a certification, or, if a doctor "is not physically present in the emergency department," a "qualified medical person" signs a certification.  Id. at § 1395dd(c)(1).

The Act also prohibits a hospital from delaying medical screening or treatment "in order to inquire about the individual's method of payment or insurance status."  Id. at § 1395dd(h).  A hospital may, however, implement "reasonable registration processes," including "asking whether an individual is insured and, if so, what that insurance is, as long as that inquiry does not delay screening or treatment.  Reasonable registration processes may not unduly discourage individuals from remaining for further evaluation." 42 C.F.R. § 489.24(d)(4)(iv).

EMTALA authorizes both administrative and private civil actions for violations of the Act.  Regulators may impose civil monetary penalties of up to $50,000 against a hospital or physician who "negligently" violates the statute.  42 U.S.C. § 1395dd(d)(1).

11

With respect to a private civil action, the Act provides that

> [a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

Id. at § 1395dd(d)(2).

### 3. Parties' Arguments

Count One of the first amended complaint alleges that Beaumont violated

EMTALA because Beaumont, before screening or treating plaintiffs, required them to

sign a form entitled "General Consent to Treatment" (consent form) that contained, inter

alia, a three-sentence paragraph that states as follows:

> **7.  Payment:** I assign and authorize payment from my insurance company directly to William Beaumont Hospital/Beaumont Professional Services, for any and all services rendered.  I agree to pay, at the time of discharge or on an interim basis (agreed upon by the hospital), all charges not covered by my insurance company.  I understand that it is my primary responsibility to pay the Hospital all charges for services rendered irrespective of any disputes or disagreements between myself and insurance companies.

Am. Compl. at ¶ 20 and Ex. A (emphasis in original).  Plaintiffs say that "Beaumont

required [them] to sign payment guarantees before they were screened or treated.

Such conditional screenings and treatment violate EMTALA's requirement that patients

must be screened or treated 'without regard to ability to pay.'" Id. at ¶ 89.

Beaumont says that every patient, regardless of insurance status, must sign the

consent form and that it has no special applicability to uninsured patients like plaintiffs.

Beaumont says that plaintiffs have failed to state an EMTALA claim because (1) the

consent form is not an inquiry into a patient's insurance status or method of payment,

(2) plaintiffs do not allege any delay in screening of treatment attributable to them
having to sign the consent form, (3) they allege no personal harm attributable to any
delay occasioned by them signing the consent form, and (4) the consent form is a
"reasonable registration process" that EMTALA specifically sanctions.

### 4. Analysis

As an initial matter, Woods says that he visited Beaumont in November 2001.
Accordingly, his claim is barred by EMTALA's two-year statute of limitations.[11]

The remaining plaintiffs' allegations fail to state a cognizable claim under
EMTALA.[12]  The plaintiffs do not allege that Beaumont failed to provide them with an
appropriate medical screening.  They likewise do not allege that Beaumont failed to
stabilize them or that Beaumont transferred them to another hospital.  Accordingly, they
have failed to state claims under subsections (a), (b), and (c) of the Act.  Rather,
plaintiffs predicate their EMTALA claim on the fact that Beaumont asked them to sign
the consent form that included a paragraph stating that the patient agrees to be
responsible for paying all charges not covered by insurance.  Despite plaintiffs' failure to
indicate the EMTALA provision on which they rely, the only provision arguably related to
Beaumont's request to have plaintiffs sign the consent form is subsection (h), which, as
discussed above, precludes a hospital from delaying a medical screening examination

---

[11] "No action may be brought under this paragraph more than two years after the
date of the violation with respect to which the action is brought."  42 U.S.C. §
1395dd(d)(2)(C).  An EMTALA claim accrues on the date of treatment.  Kizzire v.
Baptist Health Sys., Inc., 343 F. Supp. 2d 1074, 1084 (N.D. Ala. 2004).

[12] The first amended complaint is silent with respect to which EMTALA
provision(s) plaintiffs seek to invoke for purposes of this case.  As discussed below,
however, plaintiffs have failed to state a claim under any section of the Act.

13

or treatment in order to inquire about a patient's method of payment or insurance status.

Noticeably absent from the consent form plaintiffs signed, however, is any information

regarding plaintiffs' method of payment or insurance status.  The consent form merely

recites, inter alia, that the patient agrees to assume financial responsibility for charges

not covered by insurance.  Additionally, and significantly, the first amended complaint is

devoid of any allegation that Beaumont delayed screening or treating any of the

plaintiffs to inquire about their method of payment or insurance status.

     The first amended complaint states that "Beaumont required Plaintiffs . . . to sign

'consent to treatment' payment guarantees before they were screened or treated,

thereby causing Plaintiffs' treatment to be delayed."  Plaintiffs' attempt to make out an

EMTALA violation by virtue of the fact that screening or treatment was delayed as a

result of them signing the consent form is unpersuasive.  As Beaumont notes in its

response brief, every patient who presents to Beaumont's emergency rooms must sign

the consent form regardless of insurance status, and there is nothing in the first

amended complaint to suggest the contrary.  Indeed, plaintiffs' suggestion that the time

required to review and sign the consent form amounts to a delay violative of EMTALA is

untenable.  See, e.g., Quinn v. BJC Health Sys., 364 F. Supp. 2d 1046, 1054 (E.D. Mo.

2005) ("Requiring an individual to sign a standard intake form does not violate EMTALA,

and hospitals may follow reasonable registration processes, including asking whether

the individual is insured.").

     As noted above, EMTALA specifically sanctions "reasonable registration

processes."  Under the Act's implementing regulations, such registration processes

"may not unduly discourage individuals from remaining for further evaluation." 42 C.F.R.

14

§ 489.24(d)(4)(iv).  Nothing in the first amended complaint suggests that plaintiffs were discouraged from remaining at Beaumont for further evaluation:

- ▸ Jennifer Burton went to Royal Oak Beaumont twice and Troy Beaumont once.  Hospital staff evaluated and treated her on each visit: they twice gave her Motrin for a headache and once administered an injection for pain;

- ▸ Niaya Burton was evaluated and treated at Royal Oak Beaumont for asthma and bronchitis; and

- ▸ Freddie Kennedy-Neal was evaluated and treated at Royal Oak Beaumont for numbness in her legs.  Hospital staff performed lab work and obtained a chest X-Ray and an EKG.

Plaintiffs simply have failed to allege any delay in screening or treatment directly or indirectly attributable to signing the consent form.

Plaintiffs' allegations likewise are not in accord with the public policy behind EMTALA, namely, discouraging hospitals from "patient dumping." See supra.  Despite plaintiffs' uninsured status, Beaumont evaluated and treated each of them when they came to the Royal Oak Beaumont and Troy Beaumont emergency rooms.  Notably, plaintiffs do not allege that Beaumont treated them differently than insured patients, except for their allegation that the amounts charged were higher than those charged insured patients.  In a case containing allegations nearly identical to those plaintiffs bring here, a judge in the Northern District of Florida recently dismissed an EMTALA claim where plaintiffs did not allege that they failed to receive an "appropriate medical screening examination" after signing a payment guarantee form.  Jakubiec v. Sacred Heart Health Sys, Inc., 2005 WL 1261443, *1 (N.D. Fla. May 27, 2005).

Neither plaintiff has alleged, however, that after signing the payment guarantee form she did not receive an "appropriate medical screening examination" for her condition, i.e., one similar to that provided to a non-

15

> indigent or insured patient.  Nor, as this court reads the complaints, has either plaintiff alleged that being required to sign an agreement to pay her medical expenses improperly delayed the receipt of an appropriate medical screening or treatment.

Id. at *3 (internal citations omitted).

Finally, even if plaintiffs had a cognizable EMTALA claim, they have failed to allege any "personal harm" that is a "direct result" of an EMTALA violation.  See 42 U.S.C. § 1395dd(d)(2)(A).  The harm alleged is economic harm in the form of, inter alia, "grossly inflated medical debt[,] . . . subsequent collections efforts, court judgments, and liens."  Am. Compl. at ¶ 85.  Plaintiffs then allege that this economic harm has caused them "humiliation, embarrassment, and stress."  Id. at ¶ 86.  In essence, plaintiffs allege that they suffered harm by virtue of Beaumont billing them for their medical care.  EMTALA does not encompass recovery for purely economic injury.  See, e.g., Valencia v. Miss. Baptist Med. Ctr., Inc., 363 F. Supp. 2d 867, 880 (S.D. Miss. 2005) ("every court addressing the issue has determined that economic injuries are insufficient for a showing of personal harm under the EMTALA.").  Although plaintiffs attempt to salvage their argument by citing the District of South Carolina's decision in Fotia v. Palmetto Behavorial Health, 317 F. Supp. 2d 638 (D.S.C. 2004), the attempt is unpersuasive.  The claim in Fotia was brought under EMTALA's whistleblower provision, 42 U.S.C. § 1395dd(i), which provides that

> [a] participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

While plaintiffs urge the Court to disregard the fact that Fotia was premised on

16

EMTALA's whistleblower provision because "that distinction is not relevant. . . .," see Pl. Br. at 7 n.3, the distinction is highly relevant. Indeed, the Fotia court limited its analysis to the Act's whistleblower provision and concluded that whistleblowers asserting a retaliation claim under EMTALA may recover financial losses. Fotia, 317 F. Supp. 2d at 642. The Fotia court did not state that patients like plaintiffs here should be allowed to recover purely economic damages under the separate EMTALA provision allowing for civil enforcement for "personal harm." Simply put, plaintiffs' allegations, as imaginative as they may be, are insufficient to establish the kind of harm that EMTALA is designed to redress.

### B. Beaumont's Motion for Judgment on the Pleadings[13]

### 1. Legal Standard

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) requires the Court to accept all factual allegations in the complaint as true and construe them in

---

[13] The parties did not follow the Court's motion practice guidelines with respect to Beaumont's Motion for Judgment on the Pleadings. Plaintiffs combined their response brief with their notebook containing cases on which they rely. Briefs should be separate from any case or exhibit notebook. Additionally, neither party provided the Court with copies of the cases on which they rely in the Court's preferred Westlaw format. The parties instead provided the Court with cases in Lexis format. For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/cohn/motion.htm.

Additionally, the docket indicates that neither party obtained an order allowing their briefs to exceed the page limits articulated in E.D. Mich. LR 7.1(3). Beaumont's brief in support of the instant motion is 30 pages in length, and plaintiffs filed a 61-page response. Plaintiffs' brief is excessive in length. The arguments with respect to the five counts of the first amended complaint that are the subject of Beaumont's motion are not so novel or complex as to require such a lengthy brief. Indeed, plaintiffs' brief contains very few citations to Michigan authority and instead contains numerous citations to authority from other jurisdictions that is not binding on the Court. This is surprising, given that plaintiffs maintain that five out of the six remaining claims in the first amended complaint are premised on Michigan law.

17

favor of the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The Court need

not, however, accept as true "legal conclusions or unwarranted factual inferences."

Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).  The Court's inquiry

is limited to whether the challenged pleadings set forth allegations sufficient to make out

the elements of a right to relief.  Windsor v. The Tennessean, 719 F.2d 155, 158 (6th

Cir. 1983).  The Court cannot consider matters outside the pleadings when analyzing a

motion under Rule 12(c); otherwise the motion will be construed as one for summary

judgment under Fed. R. Civ. P. 56(c).  See FED. R. CIV. P. 12(c); see also Evans v.

Wilkerson, No. 95-4343, 1996 WL 593524, **1 (6th Cir. Oct. 15, 1996).

## 2. Analysis

As an initial matter, analysis of some of the claims at issue requires an

examination of the exhibits attached to the first amended complaint and the answer,

specifically the consent form (attached to the first amended complaint), invoices to

plaintiffs (attached to the answer), and the charity care discount schedule (attached to

the answer).  The Court is aware that, in considering a motion for judgment on the

pleadings, it cannot consider materials outside the pleadings.  Because the parties

attached these documents as exhibits to the first amended complaint and the answer,

they are considered part of the pleadings for purposes of the instant motion.  See FED.

R. CIV. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a

part thereof for all purposes.").  Thus, by examining the documents, the Court does not

run afoul of Rule 12(c)'s prohibition on considering materials outside the pleadings.

**a. Count Two:**
**Breach of Contract Under Michigan Law**

**i.**

Plaintiffs say that they entered into "express form contracts" with Beaumont, namely the consent form, when they went to the emergency rooms at Royal Oak Beaumont and Troy Beaumont.  They say that paragraph seven of the consent form, <u>supra</u>, which states that a patient agrees to pay all charges not covered by insurance, does not identify or fix a specific price for medical services and supplies.  Accordingly, plaintiffs say, Beaumont's charges must be reasonable.  They also say that Beaumont "abused this open pricing term by requiring its uninsured patients to pay unfair, unreasonable, discriminatory and inflated rates which are not imposed upon any other category of patients."  Plaintiffs claim Beaumont breached its obligations under the consent form by charging them "inflated and discriminatory rates," which they say also constitutes a breach of Beaumont's duty of good faith and fair dealing.

Beaumont says that plaintiffs' breach of contract claim fails because (1) they base their claim on obligations that are contrary to the express contract terms, (2) the undisputed facts show that Beaumont did not breach any obligation, (3) none of the plaintiffs has fully performed their contracts with Beaumont, and (4) plaintiffs cannot show damages resulting from Beaumont's alleged breach.

**ii.**

Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach

19

caused the other party injury.  Webster v. Edward D. Jones & Co., L.P., 197 F.3d 815, 819 (6th Cir. 1999).  If the language of a contract is unambiguous, the language is reflective of the parties' intent as a matter of law.  Quality Prods. and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375 (2003).

First, the language of the consent form that plaintiffs challenge is clear and unambiguous.  It expressly states that the patient signing the form agrees to pay all charges not covered by insurance.  Plaintiffs, however, say that because the contract language does not define or specify the charges that they agreed to pay when they signed the form, the price term should be deemed "open," thus requiring Beaumont "to charge the Plaintiffs . . . no more than a fair and reasonable rate for such medical care." Am. Compl. at ¶ 96.[14]  The pleadings belie plaintiffs' claim.

The plaintiffs attempt to invoke the implied covenant of good faith and fair dealing to support the argument that the consent form requires Beaumont to charge them "reasonable" rates for medical care.  Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts.  Ferrell v. Vic Tanny Int'l, Inc., 137 Mich. App. 238, 243 (1984).  See also RESTATEMENT (SECOND) OF CONTRACTS § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").  Michigan

_____

[14] Plaintiffs cite the Uniform Commercial Code (UCC) for the proposition that if a price is not specified in a contract then the price charged must be reasonable.  The UCC, however, is inapplicable here because the contracts at issue are service contracts and not contracts for the sale of goods.  While plaintiffs concede that the UCC does not apply, they cited a case from Missouri (Allied Disposal, Inc. v. Bob's Home Serv., Inc., 595 S.W.2d 417, 421 (Mo. Ct. App. 1980)) – not Michigan – for the notion that, notwithstanding that the UCC does not apply, its provisions nonetheless "reflect the legislative policy of the state."

20

does not, however, recognize a claim for breach of an implied covenant of good faith and fair dealing separate from an action on the underlying contract. Belle Isle Grill Corp. v. City of Detroit, 256 Mich. App. 463, 476 (2003). Additionally, the implied covenant of good faith and fair dealing cannot be used to override express contract terms. Gen. Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1041 (6th Cir. 1990). The papers do not demonstrate that Beaumont acted in bad faith when it charged plaintiffs for their medical care. Indeed, Beaumont attached to its answer copies of invoices for the Burtons that show that Beaumont's charges for certain services were uniform regardless of whether the Burtons had insurance or did not have insurance at the time of treatment. Also of significance is that Beaumont has a need-based charity-care policy that provides discounted medical care to certain uninsured patients. See Answer, Ex. B. Nowhere do plaintiffs allege that they inquired about or attempted to qualify for Beaumont's charity-care discount.

Also problematic is the element of breach. Plaintiffs say that Beaumont breached the contract when it sent them "highly inflated bills . . . which are unreasonable in relation to the hospital's actual costs." Pl. Br. at 20. First, this conclusory statement simply has no support. Plaintiffs do not set forth facts to support the conclusion that Beaumont's charges are unreasonable as compared to its actual costs. Second, it is incongruous to assert that Beaumont breached the contract by fully performing its obligation to provide medical treatment to the plaintiffs and then sending them invoices for charges not covered by insurance. Plaintiffs, by signing the consent form, agreed to, inter alia, assume responsibility for the medical charges not covered by insurance. Regardless of whether Beaumont's charges were reasonable, it is

21

undisputed that plaintiffs have not paid the charges in full.  Thus, according to the express and unambiguous contract language, plaintiffs have breached these agreements.  "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."  Flamm v. Scherer, 40 Mich. App. 1, 8-9 (1972).

Finally, even if Beaumont did breach a contract, plaintiffs' allegations of damages are insufficient to keep their case in court.  One of the founding principles of contract law is the rule of Hadley v. Baxendale, 9 Exch. 341 (1854).  The Michigan Supreme Court follows this rule, which provides that "the damages recoverable for breach of contract are those that arise naturally from the breach or those that were in contemplation of the parties at the time the contract was made."  Kewin v. Mass. Mut. Life. Ins. Co., 409 Mich. 401, 414 (1980).  Although the first amended complaint states that Beaumont's alleged breach of contract "have proximately caused the Plaintiffs . . . economic damages," Am. Compl. at ¶ 99, plaintiffs' brief notes that they instead claim non-economic damages in the form of "collection notices, adverse credit reports, repeated harassing phone calls, threats of litigation, litigation, liens, garnishments, financial hardship, and bankruptcy because of the highly inflated charges."  Pl. Br. at 22.  These non-economic damages did not arise naturally from Beaumont's alleged breach, nor could they have been in contemplation of the parties at the time the plaintiffs signed the consent form.  Indeed, these damages arose as a result of plaintiffs' failure to pay Beaumont's charges.

22

**b. Count Three:**
**Violation of the Michigan Consumer Protection Act**

Plaintiffs say that Beaumont violated the MCPA through its "deceptive, unfair, discriminatory, unconscionable, unethical, immoral, and oppressive" conduct in charging plaintiffs "the highest and full uncompensated cost for their personal medical care." Am. Compl. at ¶ 104. Specifically, plaintiffs say that Beaumont violated the following sections of the MCPA:

- M.C.L. § 445.903(1)(g)  Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented;

- M.C.L. § 445.903(1)(h)  Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity in immediate conjunction with the advertised goods or services;

- M.C.L. § 445.903(1)(i)  Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

- M.C.L. § 445.903(1)(n)  Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction;

- M.C.L. § 445.903(1)(o)  Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction;

- M.C.L. § 445.903(1)(r)  Representing that a consumer will receive goods or services "free", without charge", or words of similar import without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised;

- M.C.L. § 445.903(1)(s)  Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

23

- M.C.L. § 445.903(1)(x)  Taking advantage of the consumer's inability reasonably to protect his or her interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability;

- M.C.L. § 445.903(1)(z)  Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;

- M.C.L. § 445.903(1)(bb)  Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

- M.C.L. § 445.903(1)(cc)  Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.[15]

Am. Compl. at ¶ 106.  Beaumont says that it is exempt from regulation under the MCPA based on an express statutory provision within the Act.  Beaumont is correct.

The MCPA contains a provision that exempts from the Act's coverage certain transactions and conduct "specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States."  M.C.L. § 445.904(1)(a).  The Michigan Supreme Court has held that, in determining if a transaction or conduct is exempt from the scope of the MCPA, "the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is 'specifically authorized.'  Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited."

_____

[15] The Court is constrained to observe that plaintiffs' claims with respect to the MCPA is another illustration of what is a quintessential "shotgun pleading."  See, e.g., GJR Invs., Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1368 (11th Cir. 1998) (characterizing a complaint that "presents scores of allegations regardless of their relevance and incorporates them in their entirety into several counts asserting discrete claims for relief. . . .").

24

Smith v. Globe Life Ins. Co., 460 Mich. 446, 465 (1999).

The "specific misconduct" of which plaintiffs complain here is Beaumont's "conduct in charging Plaintiffs . . . the highest and full uncompensated cost for their personal medical care."  Am. Compl. at ¶ 104.  The "general transaction," however, is Beaumont's action of billing plaintiffs for the medical care they received at Beaumont. This "general transaction" is specifically authorized by law.  The health-care industry is highly regulated at the state and federal levels.  In Michigan, the state's public health code, M.C.L. § 333.1101 et seq., governs.  The code was enacted to, inter alia, "protect and promote the public health," to "provide for the . . . regulation . . . of . . . health services and activities," to "regulate . . . facilities[ ] and agencies affecting the public health," and to "provide for penalties and remedies; to provide for sanctions for violations of this act and local ordinances."  See 1978 Mich. Pub. Acts 368.  Indeed, Michigan's public health code sets forth a comprehensive scheme for licensing "health facilities or agencies."  See M.C.L. § 333.20131.  As a hospital, Beaumont is within the code's definition of a "health facility or agency."  See M.C.L. § 333.20106.  The code provides that a health facility's license can be denied, limited, suspended, or revoked for a number of reasons, including "the denial of a patient's rights."  M.C.L. § 333.20165(1)(f).  Patient rights under the code include a health facility's billing practices. See M.C.L. § 333.20201(2)(i).  The code states that "[a] patient or resident is entitled to receive and examine an explanation of his or her bill regardless of the source of payment and to receive, upon request, information relating to financial assistance available through the facility."  Id.  The code contains enforcement provisions that allow a person to complain of a violation of the code to the Michigan Department of

25

Community Health.  M.C.L. § 333.20176.  Consistent with these provisions of the public health code demonstrating the comprehensive regulatory scheme Beaumont must follow, along with the holding in <u>Smith</u>, Beaumont is exempt from coverage under the MCPA.

Plaintiffs attempt to circumvent this result by citing to a Michigan Court of Appeals decision that predates the Michigan Supreme Court's <u>Smith</u> decision by two years, <u>Nelson v. Ho</u>, 222 Mich. App. 74 (1996).  Apart from <u>Nelson</u> predating the decision in <u>Smith</u>, <u>Nelson</u> is inapplicable here because (1) it did not address the MCPA's exemption provision, and (2) it involved a patient suing a doctor for medical treatment; not a patient suing a hospital for its billing practices, as is the case here.

Plaintiffs also seek to distinguish <u>Smith</u> on the grounds that <u>Smith</u> involved an insurance transaction.  They cite language from <u>Smith</u> that indicates "the extensive statutory and regulatory scheme" applicable to the insurance industry.  These statements are of no moment, however, because, as discussed above, the health-care industry is highly regulated, and perhaps even more regulated, than the insurance industry.  Additionally, and significantly, the Michigan public health code regulates the "general transaction" about which the plaintiffs complain.  The plaintiffs also urge the Court to note that nothing in Michigan's public health code specifies how much a hospital can or cannot bill an uninsured patient.  This, however, ignores the holding from <u>Smith</u>, because it asks the Court to inquire into the alleged "specific misconduct," <u>i.e.</u>, Beaumont's alleged practice of overcharging the plaintiffs for their medical care.  Such an inquiry is squarely in conflict with <u>Smith</u>, which instructs the Court to only inquire into the "general transaction," regardless of whether the "specific misconduct" is prohibited.

26

See Smith, 460 Mich. at 465.

### c. Count Four:
### Unjust Enrichment/Constructive Trust Under Michigan Law

Plaintiffs say that Beaumont has been unjustly enriched at the plaintiffs' expense by "charging and collecting inflated and discriminatory rates." Am. Compl. at ¶ 111. They also say that they are entitled to damages resulting from this alleged unjust enrichment, including the imposition of a constructive trust on profits Beaumont obtained by overcharging the plaintiffs. Id. at ¶ 116. Beaumont says that this claim fails because (1) an express contract exists between the parties, which precludes an unjust enrichment claim; and (2) plaintiffs cannot prove that Beaumont unjustly received a benefit from them because they have not paid the charges Beaumont billed them for providing them medical care.

Under Michigan law, a claim for unjust enrichment requires (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. Dumas v. Auto Club Ins. Ass'n, 437 Mich. 521, 546 (1991). In such circumstances, the law implies a contract to prevent unjust enrichment. Martin v. East Lansing Sch. Dist., 193 Mich. App. 166, 177 (1992). A contract will be implied only if there is no express contract. Campbell v. City of Troy, 42 Mich. App. 534, 537 (1972). "There cannot be an express and implied contract covering the same subject matter at the same time." Id. (internal citation omitted).

Plaintiffs concede that "[r]ecovery under the theory of unjust enrichment presupposes the absence of an enforceable contractual agreement." They then state

27

that, consistent with Fed. R. Civ. P. 8, they are permitted to plead alternative theories of recovery.  While this is true, it is undisputed that express contracts between the parties exist.  An unjust enrichment claim is inconsistent with this circumstance, as unjust enrichment is not a viable claim if an express contract governs.  See Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996) (applying Michigan law) ("Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment."). See also Campbell, 42 Mich. App. at 537.  Accordingly, plaintiffs cannot maintain an unjust enrichment claim.

Even if plaintiffs could maintain a claim for unjust enrichment, however, only Woods alleges that a payment has been made to Beaumont for his medical care.  The first amended complaint says that Woods' mother has partially paid the bills for Woods' care.  Apart from Woods, no other plaintiff has alleged that they have paid any amount to Beaumont.  Woods does not show how receipt of partial payment of his Beaumont invoice rises to the level of an inequity or unjust enrichment.  Plaintiffs also base their claim on Beaumont's alleged unjust enrichment "by members of the Class who have paid Beaumont some or all of the inflated overcharges for medical care."  Any references to a class or class members are irrelevant.  This case has not been certified as a class action.

### d. Count Five:
### Declaratory Judgment/Injunctive Relief Under Michigan Law

Plaintiffs say that a declaratory judgment is necessary "to guide Plaintiffs . . . in their future conduct to preserve their legal rights."  Am. Compl. at ¶ 119.  Specifically,

28

plaintiffs seek "a determination of the legality or illegality of the billing and collection of inflated amounts, as such a determination will affect whether and where Plaintiffs . . . will procure medical services in the future, and will guide their dealings with the Hospital and bill collectors for amounts already alleged to be due." Id. Plaintiffs also seek a preliminary and/or permanent injunction relating to Beaumont's billing and collection practices. Id. at ¶ 120. Beaumont says that the relief plaintiffs seek is duplicative of the other counts of the first amended complaint. This is true.

The plaintiffs seek to invoke Michigan's declaratory judgment rule, which provides that "[i]n a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MICH. CT. R. 2.605. Plaintiffs say that the declaratory judgment is necessary because "they are entitled to know exactly what they are legally bound to pay" and because "[t]here is no way for an uninsured patient to predict ahead of time and the hospital refuses to disclose even estimates, arguing that it has no such duty." Pl. Br. at 58. Based on these assertions, it is clear that this count is duplicative of other counts in the first amended complaint, primarily the breach of contract count. See Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C., 176 F.3d 904, 908 (6th Cir. 1999) (applying Michigan law) (holding that declaratory judgment would be redundant to relief already sought for breach of contract); Florists' Transworld Delivery, Inc. v. Fleurop-Interflora, 261 F. Supp. 2d 837, 847 (E.D. Mich. 2003) (same).

### e. Count Six:
### Breach of Fiduciary Duties Under Michigan Law

Plaintiffs in Count Six of the first amended complaint say that Beaumont owed them fiduciary duties as a not-for-profit healthcare provider.  Am. Compl. at ¶ 122. Specifically, plaintiffs say that, as a "nonprofit charity hospital," Beaumont is in a "position of great control and confidence over the patients it serves" and that "Beaumont used and abused this position of influence to impose payment guarantees as a condition of treatment, provide medical care at undisclosed rates, and then deceptively overcharge uninsured patients."  Id. at ¶ 123.  Beaumont says that plaintiffs' claim fails because (1) Michigan law does not recognize a per se fiduciary duty that hospitals owe patients; and (2) even if plaintiffs properly alleged a fiduciary duty owed to them, they have failed to plead any facts demonstrating a breach of the duty.

"[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another."  Teadt v. Lutheran Church Missouri Synod, 237 Mich. App. 567, 580-81 (1999).  The party with the duty must act for the benefit of the other with respect to matters within the scope of the relationship.  Id. at 581.  "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed."  Id.

While Michigan courts have recognized fiduciary relationships such as trustees and beneficiaries, guardians and wards, attorneys and clients, and doctors and patients, see Portage Aluminum Co. v. Kentwood Nat'l Bank, 106 Mich. App. 290, 294 (1981), there is no authority for the proposition that a fiduciary relationship exists between a hospital and a patient for what plaintiffs complain of here, namely billing practices.

30

Indeed, in the context of a doctor-patient relationship, Michigan courts have limited a fiduciary duty to medical care. See Melynchenko v. Clay, 152 Mich. App. 193, 197 (1986) ("The relation between treating physician and patient, requiring confidence, trust, and good faith, is founded on the proper diagnosis and treatment of medical problems."). Plaintiffs here do not challenge the quality of the medical care they received, nor do they challenge the treating physicians' diagnoses or treatment directives. Rather, they complain of billing practices. They attempt to stretch the logic of the fiduciary relationship that exists between a doctor and a patient to encompass a hospital's billing practices for medical services rendered. In essence, plaintiffs are asking the Court to impose a fiduciary duty on a creditor-debtor relationship. Michigan law does not authorize the imposition of such a duty. See Farm Credit Servs. of Michigan's Heartland, PCA v. Weldon, 232 Mich. App. 662, 680-81 (1998) (refusing to extend a fiduciary relationship to a lender-borrower context); Glidden Co. v. Jandernoa, 5 F. Supp. 2d 541, 549 (W.D. Mich. 1998) (applying Michigan law) (noting that the typical debtor-creditor relationship does not include fiduciary duties). Beaumont is entitled to judgment on this claim as well.

## IV. Conclusion

Plaintiffs' participation in the nationwide attack on charity care at not-for-profit hospitals with a two-tiered rate structure is an attempt to correct a perceived social shortfall. Plaintiffs, however, have chosen the wrong forum for a redress of the inequities they argue. A court is not the proper arbiter of the legitimacy of plaintiffs' positions or the societal institution to correct the wrong, if it is a wrong. Simply put, the arguments plaintiffs advance in the first amended complaint have no support in law.

31

Indeed, no court presented with a similar case has found for the plaintiffs on any

substantive legal issue.  Rather, plaintiffs should address themselves to the Michigan

Legislature or Michigan's Attorney General.  By bringing this case, plaintiffs are acting

as a private attorney general—something the Court cautioned against when it dismissed

their claim of Beaumont's alleged breach of a charitable trust:

> [E]ven if the Burtons were able to establish the existence of a charitable
> trust and a breach, the Burtons would not be proper parties for purposes
> of prosecuting the breach.  It is well established that private parties like the
> Burtons may not sue to enforce a charitable trust in circumstances like the
> Burtons claim here; rather, the Attorney General is the proper party.

Dec. 3, 2004 Order at 12-13.  Judicial activism takes many forms, and it is never to be

eschewed when appropriate to the wrongs asserted.  This, however, simply is not the

case for it.

SO ORDERED.


 s/Avern Cohn

Dated:  June 20, 2005                       AVERN COHN
                          UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was sent to counsel of record on
this date, June 20, 2005, by electronic and/or ordinary mail.

 s/Julie Owens

Case Manager, (313) 234-5160